IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KOCH AGRONOMIC SERVICES, LLC,  )
                                )
        Plaintiff and           )
        Counter-Defendant,      )
                                )
    v.                          )          1:14CV679
                                )
ECO AGRO RESOURCES LLC,         )
                                )
        Defendant and           )
        Counter-Claimant.       )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Counter-Claimant Eco Agro Resources LLC ("Eco Agro") asserts numerous affirmative defenses and counterclaims against Counter-Defendant Koch Agronomic Services, LLC ("KAS") in its Amended Answer and Counterclaims ("Amended Answer"). (Doc. 25.) Presently before this court is KAS's Renewed Rule 12 Motions to Strike Eco Agro's Affirmative Defenses and to Dismiss Eco Agro's Counterclaims. (Doc. 27.)

Eco Agro has responded to KAS's motions and made several evidentiary objections in its response to KAS's motions, pursuant to Local Rule 7.6. (Doc. 34.)  KAS has replied (Doc. 35), and a hearing was held on these motion on May 20, 2015. These motions are now ripe for adjudication, and for the reasons

stated herein, this court will deny KAS's motion to strike and grant in part and deny in part KAS's motion to dismiss.

## I.  <u>FACTS</u>

KAS initiated these proceedings alleging infringement of its patent – U.S. Patent No. 5,698,003 ("the '003 patent") - by Eco Agro.  (Complaint ("Compl.") (Doc. 1) ¶¶ 3, 11.)  KAS alleges that Eco Agro directly infringed the '003 patent by "making, using, selling, offering to sell, and/or importing, without authority, products including urease inhibitors comprising n-butyl thiophosphoric triamide (NBPT) in solvents including propylene glycol and dimethyl sulfoxide."  (<u>Id.</u> ¶ 11.)  One product that KAS claims infringes the '003 patent is "N-YIELD," an Eco Agro product sold as a liquid that contains NBPT mixed with other chemicals and can be applied to urea fertilizers by fertilizer dealers.  (<u>Id.</u> ¶ 12; Eco Agro's Am. Answer & Countercls. ("Am. Answer") (Doc. 25) at 12.)[1]  The purpose of such products is to "increase the efficiency of nitrogen uptake by plant life" and "reduce the amount of

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

nitrogen fertilizer needed for crops." (Am. Answer (Doc. 25) at 10-11.)

In its Amended Answer, Eco Agro sets out ten defenses, including: (1) no infringement of the '003 patent, (2) the unenforceability of the patent, (3) the invalidity of the patent, (4) unclean hands, (5) estoppel, (6) laches, (7) inequitable conduct, and (8) patent misuse.[2] (Id. at 3-9.) KAS requests that this court strike the inequitable conduct and patent misuse defenses. (See KAS's Mots. (Doc. 27).)

Eco Agro spends some time setting out the basis for its inequitable conduct defense. Eco Agro points to "material misleading statements" made to the United States Patent and Trademark Office ("PTO") during the prosecution of the '003 patent that violated KAS's predecessor's duty of candor and "good faith." (Am. Answer (Doc. 25) at 4-5.) Specifically, Eco Agro explains that, after all claims of the '003 patent were originally rejected, co-inventor of the product, Willis L.

_____

[2] Eco Agro also asserts as its first defense that KAS has failed to state a claim upon which relief may be granted. (Am. Answer (Doc. 25) at 3.) KAS asks that this court strike this defense as well, but this court will not do so at this time. As Eco Agro explains, it is not formally making a motion to dismiss, it is merely preserving the issue. (See Eco Agro's Resp. to Pl.'s Renewed Rule 12 Mots. to Strike Affirmative Defenses & to Dismiss Countercls. ("Eco Agro's Resp.") (Doc. 34) at 37-38.)

Thornsberry, Jr. prepared an affidavit that asserted that propylene glycol "unexpected[ly]" provided "excellent long term stability of NBPT at room temperature and elevated temperature." (Id. at 5.)  However, Eco Agro has conducted its own testing and found that propylene glycol does not provide long-term stabilization of NBPT.  (See id.)  Based on this testing, Eco Agro asserts upon information and belief that KAS cannot and must not dissolve NBPT in propylene glycol in the production of its product, the process that the '003 patent protects.  (See id.)

Moreover, Eco Agro asserts that "it can be reasonably inferred that [Thornsberry] knew that his statement regarding the stability of NBPT in propylene glycol was false at the time he submitted the Affidavit to the PTO" and that the circumstances suggest he made the statement with intent to deceive the PTO.  (Id. at 6.)  Eco Agro admits in other parts of its pleading that KAS did not participate in the prosecution of the '003 patent but rather acquired the patent through the acquisition of Agrotain International ("Agrotain") in 2011. (See id. at 12, 15.)  Nonetheless, based on the allegations of false claims in Thornsberry's affidavit and KAS's alleged knowledge of their falsity due to the physical properties of

-4-

NBPT manifested in Eco Agro's test results, Eco Agro argues that KAS has engaged in inequitable conduct and should be barred from claiming patent infringement by Eco Agro.  (Id. at 4.)

Along with inequitable conduct, Eco Agro asserts patent misuse by KAS as an affirmative defense to its alleged infringement.  Eco Agro alleges that KAS is using its patents, including the '003 patent, as a means of further monopolizing the stabilized nitrogen fertilizer market.  (Id. at 21-22.)  Eco Agro alleges that KAS has engaged in this strategy even though KAS knows the '003 patent is invalid due to (1) prior art protected by a patent issued by Great Britain and discovered during proceedings in front of the European Patent Office ("EPO"); and (2) the false statements made by Thornsberry concerning the stabilizing effects of propylene glycol.  (Id. at 22-25.)  Based on these allegations, Eco Agro claims that continued enforcement of the '003 patent is objectively baseless, as "no reasonable litigant could realistically expect success on the merits" and continued litigation is merely another means of monopolizing the market for stabilized nitrogen fertilizer.  (See id. at 25.)

In addition to asserting defenses, Eco Agro also sets out twelve counterclaims, which can be categorized into two groups:

(1) allegations of anticompetitive conduct, including alleged
violations of sections 1 and 2 of the Sherman Act and sections
1, 2, and 3 of the Clayton Act; and (2) allegations of state
tort liability, including alleged unfair and deceptive practices
in or affecting commerce in violation of section 75-1.1 of the
North Carolina General Statutes; tortious interference with
prospective business contracts or relationships; commercial
disparagement; and defamation.  (See id. at 7-37.)[3]  KAS asks
this court to dismiss each of these counterclaims. (KAS Mots.
(Doc. 27) at 1.)

In support of its claims of anticompetitive conduct, Eco
Agro alleges that KAS:

> [H]as attempted, through numerous acquisitions of
> companies and their intellectual property, exclusive
> supply agreements, and sham patent litigation, to
> monopolize the market of stabilized nitrogen
> fertilizers in an effort to control the market and
> maintain or increase prices of its stabilized
> nitrogen fertilizer products by controlling supply
> and limiting competition.

(Am. Answer (Doc. 25) at 10.)  Eco Agro asserts that the
relevant product market is "the market for the sale of
stabilized nitrogen fertilizers" and the relevant geographic

---

[3] Eco Agro also asserts counterclaims requesting declaratory
judgments stating that Eco Agro has not infringed the '003
patent and/or that the patent is invalid, (see Am. Answer (Doc.
25) at 6-7), but KAS has not moved to dismiss these
counterclaims.  (See KAS's Mots. (Doc. 27) at 1.)

-6-

market is the United States. (Id. at 9.) Eco Agro alleges that products sold by KAS "dominate the stabilized nitrogen fertilizer market and account for over . . . 80% of sales and market share in stabilized nitrogen fertilizer." (Id. at 13.) Products that contain NBPT as the active ingredient, like those sold by KAS, dominate the market because NBPT is the most efficient and cost-effective method for enhancing the efficiency of nitrogen fertilizer. (See id.)

Eco Agro points to several acts completed by KAS that are allegedly anticompetitive. First, KAS acquired Agrotain, which owned the '003 patent and sold a urease inhibitor fertilizer. (Id. at 14.) Second, KAS entered into an exclusive supply relationship with Albemarle Corporation ("Albemarle") - the sole producer of NBPT in the United States - wherein KAS agreed to purchase NBPT only from Albemarle and Albemarle agreed to supply NBPT only to KAS. (Id. at 16, 19.) Third, Eco Agro suggests that KAS has "steered" at least one purchaser from KAS's products to that of one of KAS's competitors, Helena Chemical Company ("Helena"), in violation of the Sherman Act. (Id. at 17.) Helena and KAS had been engaged in litigation, but after the parties settled their litigation, prices for stabilized fertilizer products have been stable or risen. (Id.) Through

-7-

these tactics, Eco Agro alleges that KAS has made "it more difficult for Eco Agro and others [sic] competitors to enter and be competitive in the stabilized nitrogen fertilizer market." (Id. at 20.)

Along with anticompetitive conduct, Eco Agro claims that KAS has harmed Eco Agro through its statements, such as a KAS employee telling a potential Eco Agro customer that Eco Agro's CEO, Andrew Semple, "stole the Agrotain technology" - a statement that Eco Agro maintains is false. (Id.) Additionally, KAS employees allegedly:

> communicated in the marketplace to at least one Eco Agro potential customer that Eco Agro would not be able to supply its product to its customers due to [KAS's] patent suit, and that Eco Agro's customers and potential customers should instead purchase from [KAS] as a result of this lawsuit.

(Id. at 21.) Eco Agro claims these statements were "false and were made by [KAS] employees with knowledge of the falsity and with the [sic] bad faith and without justification." (Id.)

KAS has now made both a motion to strike Eco Agro's affirmative defenses of inequitable conduct and patent misuse pursuant to Rule 12(f) of Federal Rules of Civil Procedure and a motion to dismiss Eco Agro's Counterclaims III-XII for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 27.) KAS disputes many of the

foregoing facts and presents additional facts not contained in Eco Agro's pleading in support of its current motions. Eco Agro objects that these facts exceed the permissible scope of a Rule 12 motion. (See Eco Agro's Resp. (Doc. 34) at 10-12.) This court agrees and sustains these objections. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 449 (4th Cir. 2011); see also LR 7.6. However, rather than striking these factual allegations, this court has disregarded and not considered facts propounded by KAS when they rely on material not contained in Eco Agro's pleading. See, e.g., infra Part IV.A; infra note 7.

## II.  **LEGAL STANDARD**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to make a motion to dismiss due to the opposing party's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Granting a motion under Rule 12(b)(6) is proper when the complaint's factual allegations, read as true, fail as a matter of law to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). For instance, a party's Rule 12(b)(6) motion may assert that a claim is time barred only if the time bar is apparent from the face of the complaint. Farley v. CSX Transp.,

-9-

Inc., 144 F. App'x 962, 963 (4th Cir. 2005) (per curiam).

The burden, however, remains on Eco Agro, the Counter-claimant in this case, "to allege facts sufficient to state all the elements of [its] claim," see Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003), and "to raise a reasonable expectation that discovery will reveal evidence" of the misconduct alleged. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). Thus, in determining if a claim has "facial plausibility," a court is not required to accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678.

Rule 12(f) of the Federal Rules of Civil Procedure permits a district court to "strike from a pleading an insufficient defense." Fed. R. Civ. P. 12(f). A motion to strike "is the primary procedure for objecting to an insufficient defense." 5C Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, & Adam N. Steinman, Federal Practice and Procedure § 1380 (3d ed. 2014). The Fourth Circuit has explained that "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001),

## III. <u>**MOTION TO STRIKE AFFIRMATIVE DEFENSES**</u>

KAS first seeks to strike two of Eco Agro's affirmative defenses:  Eco Agro's claims of inequitable conduct and patent misuse.  This court finds that both defenses are legally sufficient, and this court will not strike either defense.

### A.   <u>**Inequitable Conduct**</u>

KAS first requests that this court strike Eco Agro's inequitable conduct defense.  "To successfully prove inequitable conduct, the accused infringer must present 'evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].'"  <u>Star Sci., Inc. v. R.J. Reynolds Tobacco Co.</u>, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (alteration in original) (quoting <u>Cargill, Inc. v. Canbra Foods, Ltd.</u>, 476 F.3d 1359, 1363 (Fed. Cir. 2007)).  The Federal Circuit has recently provided guidance on what is required to sufficiently plead inequitable conduct:

> [T]o plead the "circumstances" of inequitable conduct
> with the requisite "particularity" under Rule 9(b),
> the pleading must identify the specific who, what,
> when, where, and how of the material misrepresentation
> or omission committed before the PTO. Moreover,
> although "knowledge" and "intent" may be averred
> generally, a pleading of inequitable conduct under
> Rule 9(b) must include sufficient allegations of
> underlying facts from which a court may reasonably
> infer that a specific individual (1) knew of the

-11-

> withheld material information or of the falsity of the
> material misrepresentation, and (2) withheld or
> misrepresented this information with a specific intent
> to deceive the PTO.

Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328-29
(Fed. Cir. 2009).

This court finds that Eco Agro has sufficiently pled the circumstances of the alleged misrepresentation to the PTO, in that Eco Agro alleges that the co-inventor of the Agrotain product now sold by KAS, Willis L. Thornsberry, Jr., prepared an affidavit claiming that propylene glycol stabilized NBPT and submitted the affidavit to the PTO in an attempt to rectify any deficiencies in the patent application that previously caused it to be rejected. (See Am. Answer (Doc. 25) at 4-5.) Furthermore, this court finds that it is reasonable to infer that Dr. Thornsberry had the required knowledge and intent for Eco Agro to state a claim for inequitable conduct. Although the inference supporting Thornsberry's knowledge of his affidavit's falsity and his specific intent to deceive the PTO is somewhat tenuous, Eco Agro alleges that it has conducted testing and knows of the results of a third-party's tests that show propylene glycol does not provide long-term stabilization of NBPT - a result that is contrary to what Thornsberry asserted in his affidavit. (See id.)

-12-

As this court construes the pleading, Eco Agro simply suggests an inference that, because propylene glycol does not stabilize NBPT under their testing, Thornsberry's tests could not show that it did. As a result, Thornsberry would have known that propylene glycol does not provide long-term stabilization of NBPT and would have known that his statements to the PTO were false.[4] Moreover, the prior denial of the '003 patent provided circumstances that suggest a deliberate decision to make a knowingly false misrepresentation – a necessary predicate for inferring deceptive intent. See Exergen Corp., 575 F.3d at 1331.

Thus, because Eco Agro's pleading sets out the specific who, what, when, where, and how of the material misrepresentation to the PTO and alleges facts necessary to support the requisite mental state, this court finds that Eco

---

[4] KAS argues evidentiary matters that may ultimately disprove Eco Agro's allegations but are not yet part of the record. For example, KAS's brief argues without citation that, "Eco Agro now alleges that propylene glycol does not stabilize NBPT . . . despite the fact its own infringing product uses propylene glycol for that very purpose." (See KAS's Mem. of Law in Supp. of Renewed Rule 12 Mots. to Strike Eco Agro's Affirmative Defenses and to Dismiss Eco Agro's Countercls. ("KAS's Mem.") (Doc. 28) at 18-19.) At this stage, there are no allegations to support this finding.

Agro's inequitable conduct defense is legally sufficient and will not strike this defense.[5]

### B.    **Patent Misuse**

KAS also claims that this court should strike Eco Agro's patent misuse defense.  The basic rule of patent misuse is that, although a "patentee may exploit his patent," the patentee "may not use it to acquire a monopoly not embraced in the patent." Princo Corp. v. Int'l Trade Comm'n, 616 F.3d 1318, 1327 (Fed. Cir. 2010). "The doctrine of patent misuse is an affirmative defense to a suit for patent infringement, and requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." Windsurfing Int'l Inc. v. AMF,

---

[5] The Federal Circuit has erected a higher evidentiary standard for succeeding on the merits of an inequitable conduct claim, but this barrier does not require a higher pleading standard.  See Exergen Corp., 575 F.3d at 1329 n.5 ("In contrast to the pleading stage, to prevail on the merits, the accused infringer must prove both materiality and intent by clear and convincing evidence.").  KAS relies on a subsequent Federal Circuit case to argue that the "single most reasonable inference" standard should govern this court's consideration of its motion to strike.  (KAS's Mem. (Doc. 28) at 18-19 (citing Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1290 (Fed. Cir. 2011).)  However, the Therasense court was considering a judgment against the patentee based on inequitable conduct, rather than considering the sufficiency of the alleged infringer's pleading.  See Therasense, 649 F.3d at 1282. Therefore, the heightened standard of Therasense is not controlling for the purposes of this motion.

-14-

Inc., 782 F.2d 995, 1001 (Fed. Cir. 1986) (citations omitted).
The Federal Circuit has cautioned that the "bringing of a
lawsuit to enforce legal rights does not of itself constitute
. . . patent misuse." Glaverbel Societe Anonyme v. Northlake
Mktg. & Supply, Inc., 45 F.3d 1550, 1558 (Fed. Cir. 1995).
However, bringing a lawsuit can be considered patent misuse if
the suit was initiated in bad faith or for some "improper
purpose," such as when "its goal is not to win a favorable
judgment, but to harass a competitor and deter others from
competition, by engaging in the litigation process itself,
regardless of the outcome." Id.

Here, Eco Agro has alleged sufficient facts supporting
patent misuse so that this court will not strike this defense at
this point in the litigation. Eco Agro makes allegations that,
if proven, show that KAS initiated this lawsuit in bad faith and
for an improper purpose. Eco Agro asserts that KAS "knows that
its patent is invalid" and that its actions of "using its
patents against . . . competitors has resulted in an unlawful
monopolization of the stabilized nitrogen fertilizer market."
(Am. Answer (Doc. 25) at 22.) Eco Agro asserts two bases
through which KAS's patent could be found invalid: (1) prior art
discovered during the EPO proceedings of which KAS should now be

aware, (id. at 22-24), and (2) Thornsberry's alleged

misrepresentations to the PTO discussed previously, (id. at 24-

25). Eco Agro alleges:

> In light of the misrepresentations made to the [PTO] that led to the issuance of the '003 Patent, as well as the prior art subsequently discovered in the EPO Patent in prosecution, no reasonable litigant could realistically expect success on the merits in litigation alleging infringement of the '003 Patent. This litigation is an attempt by [KAS] to interfere directly with the business relationships of Eco Agro and to further monopolize the market for stabilized nitrogen fertilizers.

(Id. at 25.) These allegations are sufficient to assert the

defense of patent misuse. Therefore, this court finds the

patent misuse defense pled by Eco Agro to be legally sufficient.

After finding these defenses legally sufficient, this court

is hesitant to strike these defenses for any other reason, as

motions to strike are generally disfavored. See Waste Mgmt.

Holdings, 252 F.3d at 347. Moreover, this court also finds that

these defenses do not confuse the issues in this matter, do not

cause some sort of undue prejudice, and are not irrelevant.

Accordingly, this court will not strike these defenses.

## IV. __MOTION TO DISMISS ANTICOMPETITIVE COUNTERCLAIMS__

KAS requests that this court dismiss the majority of Eco

Agro's counterclaims. Eco Agro's counterclaims can be grouped

into two categories: (1) Eco Agro's claims of anticompetitive

conduct by KAS, and (2) Eco Agro's state law claims based on disparaging statements made by KAS. This section addresses KAS's motion to dismiss Eco Agro's claims of anticompetitive conduct.

Eco Agro identifies several forms of anticompetitive conduct allegedly completed by KAS, including: (1) KAS's "exclusive supply agreement" with Albemarle for NBPT, (Am. Answer (Doc. 25) at 25-28 (Counterclaims III-IV)); (2) KAS's actual and attempted monopolization of the stabilized nitrogen fertilizer market, (id. at 28-29, 31-32 (Counterclaims V, VII)); (3) KAS's "steer[ing of] at least one purchaser who sought to purchase the stabilized nitrogen fertilizer product Agrotain from [KAS] to instead purchase stabilized nitrogen fertilizer products from Helena," (id. at 30 (Counterclaim VI)); and (4) KAS's initiation of "sham litigation," (id. at 36-37 (Counterclaim XII)) - all in violation of the Sherman Act, codified at 15 U.S.C. §§ 1-7, and the Clayton Act, codified at 15 U.S.C. §§ 12-27.

### A. Relevant Market

KAS first claims that all of Eco Agro's counterclaims of anticompetitive conduct are not sufficiently pled based on the

relevant product and geographic markets that Eco Agro asserts. This court disagrees.

Market definition is a preliminary inquiry courts use to determine the potential monopoly's market power, and as a threshold matter, a party asserting anticompetitive conduct must plead the relevant product market and the relevant geographic market. E.I. du Pont, 637 F.3d at 441. Because market definition is a "deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market," and "dismissals at the pre-discovery, pleading stage . . . are generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market." Id. at 443-44. Other bases for dismissal on the pleadings include "attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes" or "failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Id. at 443.

Here, Eco Agro claims that the relevant product market is the "market for the sale of stabilized nitrogen fertilizers" and the relevant geographic market is the United States. (Am. Answer (Doc. 25) at 9.) Eco Agro explains that "stabilized

nitrogen fertilizers" are composed of products that have "additives that reduce the transformation rate of fertilizer compounds, resulting in an extended time of nitrogen availability in the soil." (Id. at 11.) Eco Agro further pleads that there are no acceptable substitutes for stabilized nitrogen fertilizers for agricultural use and estimated sales of stabilized nitrogen fertilizers in the United States were approximately $90 to $110 million in 2013. (Id. at 15.)

KAS claims that Eco Agro's allegations should be dismissed because they do not encompass all interchangeable substitutes and therefore draw the relevant market in a deceptively narrow manner. (KAS's Mem. (Doc. 28) at 21-23.)[6] Eco Agro spends some time in its Amended Answer explaining the scope of Enhanced

---

[6] KAS attempts to rely on a recent article outside of the current pleadings to show that more nitrogen applied to the soil or nitrogen applied in a different manner is a substitute that is unaccounted for in Eco Agro's pleading. (See KAS's Mem. (Doc. 28) at 14 & n.4.) Eco Agro had cited the same article in its original answer, but the parties agree that Eco Agro's original answer is now void based on the filing of Eco Agro's Amended Answer, which does not reference the article. Because the content of the article is outside of Eco Agro's current pleading, this court will not consider contested facts or market realities expressed in the article until the parties have had a chance to conduct discovery. See E.I. du Pont, 637 F.3d at 447. The same holds true for facts outside of the pleadings used by KAS to attack the United States as being the relevant geographic market. (See KAS's Mem. (Doc. 28) at 25.) Therefore, this court will disregard all references KAS makes to facts outside of the pleadings.

Efficiency Fertilizers ("EEF"), of which "stabilized nitrogen fertilizers" are a "sub-category." (Am. Answer (Doc. 25) at 10-11.) "[S]low-release fertilizers" make up another sub-category of EEFs, (see id.), and from the face of Eco Agro's Amended Answer, it could appear that slow-release fertilizers are a reasonable substitute to stabilized nitrogen fertilizers, which would make Eco Agro's alleged market unreasonably narrow.

However, this court finds that Eco Agro has pled a plausible relevant product market. Eco Agro offers sufficient explanation for why other products outside of the stabilized nitrogen fertilizer market are not reasonable substitutes for consumers, particularly those in agriculture. (See id. at 11-12, 15 ("Slow release fertilizers are typically two-to-four times greater in cost that untreated urea, whereas stabilized nitrogen fertilizers are typically only 10% or 20% greater in cost than untreated urea.").) Based on this explanation, Eco Agro's allegations of a relevant market do not suffer from a glaring deficiency, as the allegations set forth above offer some explanation of why there are no interchangeable substitutes to stabilized nitrogen fertilizers. Additionally, this court finds that Eco Agro has sufficiently explained that Eco Agro is a part of the stabilized fertilizer market, even though Eco Agro

only sells a urease inhibitor that individuals apply to fertilizer and not the actual fertilizer itself. (See id. at 23-24.)

Eco Agro has also offered sufficient facts to allege that the United States is a plausible relevant geographic market, namely, because of the importance and difficulty in transporting NBPT. (See id. at 18.) Because this motion reviews only the allegations set forth in Eco Agro's pleading, this court does not have sufficient market information or other facts to determine whether the alleged markets are the relevant markets for the purposes of Eco Agro's anticompetitive counterclaims. Therefore, this court will move on to consider the other elements of Eco Agro's claims.

Before addressing these other elements, this court notes that, in order to succeed on its anticompetitive counterclaims, Eco Agro will need to prove that the market for stabilized nitrogen fertilizers is the relevant product market, not that the market for NBPT is the relevant product market. As part of its efforts to show that the United States is the relevant geographic market, Eco Agro alleges that NBPT is the active ingredient in the majority of products within the stabilized nitrogen fertilizer market and that the instability of NBPT

-21-

makes it difficult and expensive to ship NBPT from China and
other countries.  (See id. at 18-20.)  Eco Agro then alleges
that KAS has sought to "control supply of [NBPT]."  (Id. at 15,
19.)  Eco Agro explains that "[b]y controlling the supply of
NBPT in the United States, [KAS] has attempted to foreclose
entry into the market of stabilized nitrogen fertilizers by
competitors, including Eco Agro."  (Id. at 20.)  By making the
connection between KAS's alleged efforts to control the NBPT
market and its alleged efforts to control the stabilized
nitrogen fertilizer market, Eco Agro has alleged a plausible
relevant market.

Ultimately, this court notes that because Eco Agro has
clearly pled that the market for stabilized nitrogen fertilizer
is the relevant market on which it bases its allegations, this
court will not permit Eco Agro to proceed on the theory that the
NBPT market is the relevant market as this matter proceeds,
absent a request by Eco Agro to amend its pleadings.

**B.   Counterclaim III: Exclusive Dealing under the Sherman
Act**

Eco Agro asserts that an exclusive supply agreement formed
between KAS and the sole supplier of NBPT in the United States,
Albemarle, constitutes "exclusive dealing" in violation of
section 1 of the Sherman Act.  Eco Agro contends that the

-22-

agreement "substantially forecloses competition" in the United States market for stabilized nitrogen fertilizer by controlling the supply of NBPT, the most effective active ingredient in the relevant market. (Id. at 25-27.)

In order to state a claim under section 1 of the Sherman Act, a plaintiff must plausibly allege "(1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy." Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 144 (4th Cir. 1990). KAS claims that Eco Agro merely invokes the "magic words" of substantial foreclosure of competition without stating sufficient facts to support its allegation, that Eco Agro does not plead that a market was actually foreclosed, and that Eco Agro does not show that the market for NBPT is a relevant market. (KAS's Mem. (Doc. 28) at 24-26.)

In stating its claim under section 1 of the Sherman Act, Eco Agro alleges that (1) the stabilized nitrogen fertilizer market is a relevant market; (2) NBPT is an important ingredient within the products that make up that market; (3) KAS created an

-23-

exclusive supply agreement with the sole supplier of NBPT in the United States; (4) NBPT is difficult to transport, making contracting with other suppliers expensive; and (5) KAS now controls 80% of the stabilized fertilizer market due, in part, to the exclusive supply agreement. (See Am. Answer (Doc. 25) at 25-27.)[7] Despite KAS's arguments, this court finds that these allegations state a plausible claim of exclusive dealing under section 1 of the Sherman Act.

Before proceeding with the analysis, this court notes that KAS's brief creates significant difficulty for this court in parsing out the pleadings. Specifically, KAS's brief tends to include factual matters not subject to consideration at this stage and with citations that do not reflect the asserted facts. For example, in arguing that Eco Agro's counterclaim based on section 1 of the Sherman Act is subject to dismissal, KAS alleges:

> Even were that not the case, [Eco Agro's] allegations
> do not address the obvious question of why Chinese
> NBPT - which Eco Agro's own principals imported into
> the United States through another business - is not
> reasonably interchangeable with domestic NBPT, given

---

[7] The level of market dominance fact can be found on page 19, paragraph 65 of Eco Agro's Amended Answer, which is incorporated by reference into Eco Agro's counterclaim under section 1 of the Sherman Act. (See Am. Answer (Doc. 25) at 25, ¶ 96.)

that it acknowledges that NBPT can be purchased from
        China.

(KAS's Mem. (Doc. 28) at 25 (citing Am. Answer (Doc. 25) ¶¶ 40,

46-47).)  None of the cited paragraphs contain a concession from

Eco Agro that its "own principals imported [NBPT] into the

United States."  (KAS's Mem. (Doc. 28) at 25; see also Am.

Answer (Doc. 25) at 13, 15 (providing general information on

NBPT).)  Furthermore, Eco Agro's counterclaims describe the cost

issues of shipping NBPT from China.  (See Am. Answer (Doc. 25)

at 19-20.)  As noted earlier, this court will disregard all

references KAS makes to facts outside the pleadings.  KAS seems

to be aware of the complexity of the matters at issue and to

further confuse the issues by referring to matters outside of

the pleadings and not in evidence is not an appropriate tactic.

        Moving forward, to prevail on the merits of this claim, Eco

Agro will need to establish that the foreclosure was substantial

and that the agreement was unreasonable, with the "unacceptable

level of market foreclosure" not being justified by the

"procompetitive efficiencies" created by the conduct.  See

Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289,

1294 (4th Cir. 1987).  However, this determination of whether

the foreclosure was substantial and unreasonable "requires a

market analysis of the impact the restraining activity has on

                                -25-

competition." Advanced Health-Care Servs., 910 F.2d at 145.  At

this point, with Eco Agro's allegations being accepted as true,

summary dismissal is inappropriate because this court cannot

look outside Eco Agro's pleading to conduct such a market

analysis.  See id.  Therefore, Eco Agro's counterclaim that

KAS's exclusive supply agreement violates section 1 of the

Sherman Act will not be dismissed at this time.

### C.   Counterclaim IV: Exclusive Dealing under the Clayton Act

Along with asserting violations of the Sherman Act, Eco

Agro claims that the exclusive supply agreement between KAS and

Albemarle violates section 3 of the Clayton Act.  (See Am.

Answer (Doc. 25) at 28.)  Section 3 of the Clayton Act makes it

unlawful:

> for any person engaged in commerce . . . to lease or
> make a sale or contract for sale of goods . . . on the
> condition, agreement, or understanding that the lessee
> or purchaser thereof shall not use or deal in the
> goods . . . of a competitor or competitors of the
> lessor or seller, where the effect . . . may be to
> substantially lessen competition or tend to create a
> monopoly in any line of commerce.

15 U.S.C. § 14 (2012); see also Tampa Elec. Co. v. Nashville

Coal Co., 365 U.S. 320, 325-29 (1961) (explaining the

application of section 3 of the Clayton Act).

KAS claims that Eco Agro has not stated a claim under section 3 of the Clayton Act because, in the exclusive supply agreement in question, KAS is the "buyer" and "Section 3 applies only to sellers." (See KAS's Mem. (Doc. 28) at 26). Based on KAS's role as a buyer, KAS asks this court to follow other courts in finding that section 3 liability only attaches to the sellers in an exclusive dealing contract. See McGuire v. CBS, Inc., 399 F.2d 902, 906 (9th Cir. 1968).

Eco Agro has not persuasively responded to KAS's argument or distinguished McGuire. As a result, this court finds McGuire persuasive. "The language of the statute defines liability in terms of a person who makes a sale or contracts for sale and nowhere provides for liability of the buyer." Id. at 906. In the alleged exclusive supply agreement between KAS and Albemarle, KAS is the buyer and, as a result, Eco Agro cannot state a claim against it under section 3 of the Clayton Act. As discussed above, this agreement can serve as the basis for a claim under section 1 of the Sherman Act, but Eco Agro has not stated a claim under section 3 of the Clayton Act.

### D.  Counterclaims V, VII: Actual & Attempted Monopolization

Eco Agro asserts that, through its conduct, KAS has actually monopolized or has at least attempted to monopolize the

stabilized nitrogen fertilizer market in violation of section 2

of the Sherman Act. (Am. Answer (Doc. 25) at 28-29, 31-32.)

> The elements of [actual and attempted monopolization
> claims] are very similar. To prevail on a
> monopolization claim, a plaintiff must show possession
> of monopoly power in a relevant market, willful
> acquisition or maintenance of that power in an
> exclusionary manner, and causal antitrust injury. To
> prove attempted monopolization, the plaintiff must
> prove a specific intent to monopolize a relevant
> market, predatory or anticompetitive acts, and a
> dangerous probability of successful monopolization.

Advanced Health-Care Servs., Inc., 910 F.2d at 147 (citations

omitted); see also E.I. du Pont, 637 F.3d at 450, 453.

To meet the elements of actual monopolization, Eco Agro has

alleged that KAS controls 80% of the stabilized nitrogen

fertilizer market and has acquired and maintained that monopoly

power - causing antitrust injury to all competitors in the

market - through the acquisition of Agrotain, the exclusive

supply agreement with Albemarle, and the bad faith enforcement

of its patent that it allegedly knows to be invalid. (See Am.

Answer (Doc. 25) at 28-29.) This court finds that these

allegations are sufficient to state a claim of actual

monopolization under section 2 of the Sherman Act.

KAS makes numerous arguments in an attempt to undercut the

facts underlying Eco Agro's allegation of actual monopolization,

but this court finds these arguments unpersuasive. First, KAS

-28-

claims that its Agrotain acquisition cannot serve as a basis for Eco Agro's claim of actual monopolization. KAS argues that, because it was not producing a urease inhibitor at the time of its acquisition of Agrotain and because Eco Agro does not claim Agrotain had a monopoly at the time of the acquisition, KAS could not have achieved monopoly power through the Agrotain acquisition alone. (See KAS's Mem. (Doc. 28) at 27-28.) However, this argument does not render Eco Agro's allegations defective because Eco Agro has alleged that KAS's conduct was used to acquire monopoly power "and maintain[] that power." (See Am. Answer (Doc. 25) at 28.) Maintenance of monopoly power through exclusionary means, such as acquiring a company to consolidate control over a market, is prohibited by section 2 of the Sherman Act, and Eco Agro's allegation can be read to proceed on that theory. Moreover, the acquisition of Agrotain is only one of several anticompetitive acts alleged by Eco Agro to have been used to acquire and maintain KAS's market power. Because Eco Agro has alleged anticompetitive conduct and alleged that these actions were used to acquire and maintain monopoly power, this court will not dismiss Eco Agro's actual monopolization claim based on this argument by KAS.

Second, KAS claims that Eco Agro does not have standing to assert its Sherman Act claim because it has not suffered antitrust injury and thus is not entitled to damages under the Sherman Act. (See KAS's Mem. (Doc. 28) at 28-29.) In examining whether a party has asserted the appropriate type of antitrust injury to confer antitrust standing, courts look to "(1) the causal connection between an antitrust violation and harm to the [party], and whether that harm was intended; and (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws." See Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 315 (4th Cir. 2007) (quoting Kloth v. Microsoft Corp., 444 F.3d 312, 324 (4th Cir. 2012)).

Eco Agro has alleged that the anticompetitive conduct set out above, such as KAS's exclusive supply relationships and acquisitions, has "made market entry more difficult for competitors like Eco Agro." (See Am. Answer (Doc. 25) at 29.) Assuming this allegation is true, the injury that Eco Agro alleges "is plainly an injury to competition that the anti-trust laws were intended to forestall. . . . [Thus, Eco Agro] has alleged harm of the type the antitrust laws were intended to prevent." See Novell, 505 F.3d at 316. Moreover, with its

allegations that KAS controlled NBPT supply, Eco Agro has
asserted that KAS effectively thwarted the ability of Eco Agro's
products to compete with KAS's products and possibly lower the
barrier to entry in the stabilized nitrogen fertilizer market,
therefore harming competition in that market.  KAS's conclusion
that Ego Agro was not harmed because competition either
benefited from lower prices or Eco Agro benefited from any
higher prices charged by KAS does not account for the harm to
competition created by KAS's activity that allegedly raised or
maintained artificially high barriers to competition.
Therefore, Eco Agro's allegations satisfy the causation
requirement at the pleading stage and establish that Eco Agro
has sufficiently pled antitrust injury.

    Third, KAS claims that Eco Agro cannot rely on KAS's
enforcement of its patent as a form of anticompetitive conduct
because "Eco Agro has not pleaded sufficient facts to show that
KAS's lawsuit is objectively baseless."  (KAS's Mem. (Doc. 28)
at 29-30.)  This court has determined that Eco Agro has stated a
legally sufficient patent misuse defense.  See supra Part III.B.
Eco Agro makes allegations that, if proven, show that KAS
initiated this lawsuit in bad faith and for an improper purpose.
Such allegations of bad faith, taken as true, would indicate

-31-

that "no reasonable litigant could realistically expect success on the merits."  See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993).  As a result, this court finds that KAS's patent infringement actions can serve as anticompetitive conduct for the purposes of stating a claim under section 2 of the Sherman Act.[8]  For these reasons, this court finds that Eco Agro has stated a claim for actual monopolization under section 2 of the Sherman Act, and as such, this court will not dismiss this counterclaim.

Eco Agro relies on similar allegations to state its claim for attempted monopolization.  (See Am. Answer (Doc. 25) at 31-32.)  This court has already determined that Eco Agro pled facts to establish KAS's anticompetitive acts, including its exclusive NBPT supply agreement with Albemarle, its acquisition of Agrotain, and its improper use of its allegedly invalid patent.  These allegations sufficiently plead the first element of attempted monopolization.  See E.I. du Pont, 637 F.3d at 453.

To assert that KAS had a specific intent to monopolize, the second element of an actual monopolization claim, Eco Agro again

_____

[8] KAS contends that statements made by Eco Agro to the press indicate that the current lawsuit is not objectively baseless. (See KAS's Mem. (Doc. 28) at 30 & n.12.)  However, because these statements are outside of Eco Agro's pleading, this court will not consider those statements at this juncture.

points to these anticompetitive acts.  (Am. Answer (Doc. 25) at 32.)  The Fourth Circuit has found on multiple occasions that, at the pleading stage, "[s]pecific intent may be inferred from the defendant's anticompetitive practices."  E.I. du Pont, 637 F.3d at 453 (quoting M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 166 (4th Cir. 1992)) (alteration in original).  Thus, the allegations referenced above lead to a reasonable inference of specific intent to monopolize.

Finally, the third element, whether KAS's attempt to monopolize has a dangerous possibility of success, has been met at this stage because this court has determined that Eco Agro has adequately pled actual monopolization.  See E.I. du Pont, 637 F.3d at 453.  Accordingly, this court will not dismiss Eco Agro's claims of actual and attempted monopolization under section 2 of the Sherman Act.

### E.    Counterclaim VI: Steering

Eco Agro states another claim under section 1 of the Sherman Act, alleging that KAS has "steered at least one purchaser who sought to purchase the stabilized nitrogen product Agrotain from [KAS] to instead purchase stabilized nitrogen fertilizer products from Helena," a competitor.  (See Am. Answer

-33-

(Doc. 28) at 30.)  Eco Agro alleges further, upon information and belief, that "the purchaser was told it could not purchase the stabilized nitrogen fertilizer product containing NBPT from [KAS], but must instead purchase from Helena."  (Id.)  Eco Agro maintains that this "steering" of a customer to Helena occurred after KAS and Helena settled litigation and is another means of controlling the market in stabilized nitrogen fertilizers and reducing competition.  (Id.)

KAS argues that this claim is "[u]nprecedented, [u]nsupported, and [i]llogical," that it fails to meet the pleading standard necessary to allege an antitrust conspiracy, that it contradicts Eco Agro's claim that KAS is a monopolist, and that it does not indicate that Eco Agro incurred antitrust injury based on this alleged steering.  (KAS's Mem. (Doc. 28) at 33-34.)  This court finds these arguments unpersuasive for the following reasons.

This court finds that Eco Agro has set out a plausible claim under section 1 of the Sherman Act.  Section 1 of the Sherman Act applies to any contract, combination, or conspiracy "in restraint of trade or commerce."  15 U.S.C. § 1.  Although Eco Agro does not use the word "conspiracy" in setting forth this counterclaim, Eco Agro has set out facts to support a

reasonable inference of an agreement or conspiracy between KAS and Helena.  In its statement of facts, which is incorporated into Eco Agro's steering claim, Eco Agro states that Helena was engaged in the stabilized nitrogen fertilizer market, that Helena "was a company of sufficient size to take market share from [KAS]" in that market, that Helena's entrance into the market caused prices to drop, and that the prices have been stable or risen since the parties settled their lawsuit and allegedly began steering customers.  (See Am. Answer (Doc. 25) at 17.)

Moreover, Eco Agro, in its brief, asserts that "steering" is a "per se antitrust violation," akin to "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." (See Eco Agro's Resp. (Doc. 34) at 32 (quoting Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49 (1990)).)  This court is not able to determine at this point whether this alleged agreement between KAS and Helena constitutes a per se antitrust violation.  Yet, even if this violation is not a per se violation, this court finds that Eco Agro has pled that the alleged agreement is a restraint on competition, and this court is unable to evaluate the reasonableness of such a restraint based simply on Eco

-35-

Agro's pleading.  See Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508-11 (4th Cir. 2002).  This court finds that the allegations set forth here are sufficient to state a claim under section 1 of the Sherman Act, and as a result, this court will not dismiss this claim.

**F.    Counterclaim XII: Sham Litigation**

In Eco Agro's final counterclaim, Eco Agro asserts a claim of "sham litigation" against KAS.  (Am. Answer (Doc. 25) at 36-37.)  Eco Agro claims that the current litigation - a lawsuit Eco Agro alleges is objectively baseless - "is an attempt to interfere directly with the business relationships of Eco Agro, a competitor of [KAS], through the use of this suit."  (Id. at 36.)  Eco Agro asserts that this suit is an attempt to preclude Eco Agro entirely from the market for stabilized nitrogen fertilizers, which will result in fewer choices for consumers and potentially higher prices.  (Id. at 36-37.)

KAS would have this court find that that there is no independent cause of action for "sham litigation" and that "sham litigation" is merely an exception to the Noerr-Pennington immunity that allows alleged patent infringers to make other antitrust claims against patent holders who initiate objectively and subjectively baseless patent enforcement litigation.  (See

KAS Mem. (Doc. 28) at 40 (citing Prof'l Real Estate Investors, Inc., 508 U.S. at 61).)  However, this court will not so find.

The Supreme Court has long held that alleged enforcement of a patent procured by fraud states a claim under section 2 of the Sherman Act.  See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174 (1965); see also Glaverbel, 45 F.3d at 1559 (recognizing that a lawsuit, brought in bad faith and for an improper purpose and in implementation of an illegal restraint on trade, could serve as a basis for a Sherman Act violation).  This court has determined that Eco Agro has stated sufficient facts to allege that the current litigation is objectively baseless and made in bad faith such that Eco Agro's various antitrust and state law claims will not be dismissed based on Noerr-Pennington or preemption.  See supra Part III.B; infra Part V.A.  Additionally, this court has found that Eco Agro has set forth the necessary elements for a claim under section 2 of the Sherman Act.  See supra Part IV.D.  For the same reasons, this court finds that Eco Agro has stated a claim under section 2 of the Sherman Act based on KAS's initiation and maintenance of "sham litigation."

**G.** **Counterclaim VIII: North Carolina Unfair and Deceptive Practices Act**

In addition to stating claims under the federal antitrust laws, Eco Agro claims that KAS's "actions of anticompetitive and monopolistic conduct . . . constitute unfair competition and unfair and deceptive trade practices as defined by the laws of . . . the State of North Carolina, including but not limited to N.C.G.S. § 75.1-1 et. seq." (Am. Answer (Doc. 25) at 32.)

Section 75-1.1 of the North Carolina General Statutes declares "unlawful" all "[u]nfair methods of competition in or affecting commerce" or "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). To show that an act or practice violates section 75-1.1, a plaintiff must demonstrate (1) an unfair or deceptive act or practice - meaning that it "offends established public policy;" is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers;" or has a tendency to deceive, see Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007); (2) the act or practice was in or affecting commerce; and (3) the act or practice proximately caused the injury to the plaintiff. See Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 35, 568 S.E.2d 893, 901 (2002).

-38-

KAS's only argument relevant to Eco Agro's claims of anticompetitive conduct under section 75-1.1 is that "to the extent that Eco Agro seeks to recast its federal antitrust claims as claims under North Carolina law, those claims should be dismissed for the same reasons the Court should dismiss the federal antitrust claims." (See KAS's Mem. (Doc. 28) at 37.) However, because this court has found that Eco Agro has stated several plausible claims under the federal antitrust laws, this court finds no reason to dismiss Eco Agro's claims of anticompetitive conduct in violation of section 75-1.1 of the North Carolina General Statutes.

## V.   MOTION TO DISMISS STATE LAW COUTERCLAIMS

Eco Agro asserts a number of claims under North Carolina law, including claims that KAS's recent statements about Eco Agro and its employees constitute unfair and deceptive practices, tortious interference with prospective business contracts or relationships, commercial disparagement, and defamation. This court finds that Eco Agro has sufficiently pled its unfair and deceptive practices claim and its defamation claim, but for the reasons stated herein, this court finds that Eco Agro's tortious interference and commercial disparagement claims should be dismissed.

-39-

## A. Noerr-Pennington Doctrine and Federal Preemption

KAS first claims that all state law claims should be dismissed because the underlying conduct is either shielded by Noerr-Pennington immunity or preempted by federal patent law. KAS contends that the allegedly tortious statements its employees made about Eco Agro were made in the process of protecting its patent rights. However, at this stage of the litigation, this court finds that Eco Agro has alleged sufficient facts to avoid dismissal based on Noerr-Pennington immunity or federal preemption.

To avoid preemption or dismissal based on the Noerr-Pennington doctrine, Eco Agro must allege that the underlying patent litigation was made in "bad faith" and was "objectively baseless." See Matthews Int'l Corp. v. Biosafe Eng'g, LLC, 695 F.3d 1322, 1332 (Fed. Cir. 2012); Globetrotter Software, Inc. v. Elan Computer Grp., Inc., 362 F.3d 1367, 1374 (Fed. Cir. 2004). Without reaching the issue of whether KAS making good faith statements to Eco Agro's customers would be protected activity that is shielded by either of these doctrines, this court finds that Eco Agro has pled sufficient facts to plausibly allege that the patent at issue is invalid and that the underlying patent litigation was initiated in bad faith. See supra Part III.B.

-40-

Therefore, Eco Agro's claims will not be dismissed based on Noerr-Pennington immunity or federal preemption at this point. Accordingly, this court will consider the merits of each of Eco Agro's state law claims.[9]

## B. Counterclaim IX: Tortious Interference with Prospective Business Contracts or Relationships

Eco Agro alleges that KAS "maliciously prevented the making of contracts between Eco Agro and potential customers of Eco Agro," when in August 2014, KAS "contacted at least one Eco Agro prospective customer" and "falsely told this customer that Eco Agro CEO Andrew Semple stole Agrotain's technology and that Eco Agro could not supply its stabilized nitrogen fertilizer product N-Yield to the customer going forward." (Am. Answer (Doc. 25) 20-21, 33 (setting forth the factual basis for KAS's communication with Eco Agro's potential customers).) Eco Agro asserts that "these statements have harmed Eco Agro's prospects of entering into a contract with customers, . . . harmed Eco

---

[9] This case is different from Matthews Int'l Corp., where the Federal Circuit found state-law claims were properly dismissed because Matthews made "bald assertions" that Biosafe had acted in bad faith but asserted no facts except for allegedly false statements to the PTO made by predecessors of Biosafe. See Matthews Int'l Corp., 695 F.3d at 1333. In this case, Eco Agro has asserted that KAS must know that the patent is invalid because Eco Agro's tests show that propylene glycol does not provide long-term stabilization of NBPT. Therefore, Eco Agro has plausibly asserted that KAS initiated this suit and made statements about this litigation in bad faith.

Agro's opportunity to sell products to these customers in the future. . . . [, and] harmed Eco Agro's reputation in the industry." (Id. at 33-34.)

North Carolina recognizes a tort for wrongful interference with a prospective economic advantage. To prove such a claim, a party "must show lack of justification for inducing a third party to refrain from entering into a contract" and that the contract "would have ensued but for the interference." Cameron v. New Hanover Mem'l Hosp., Inc., 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982). If a party claiming tortious interference does not allege a prospective sale and that it "would have been consummated but for the malicious interference," it is proper for the court to dismiss that claim. See Spartan Equip. Co. v. Air Placement Equip. Co., 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965); cf. DaimlerChrysler Corp. v. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (affirming denial of injunction because plaintiff failed to establish a likelihood of success on the merits by failing to identify any particular contract that a third party had been induced to refrain from entering into with plaintiff).

Here, Eco Agro has alleged, upon information and belief, that KAS has been in contact with at least one "prospective

customer" and that the statements have damaged Eco Agro's reputation and prospects of entering into a contract with "customers." (Am. Answer (Doc. 25) at 33-34.) However, Eco Agro has not made any allegation that Eco Agro would have entered into a contract with specific customers but for KAS's statements, and Eco Agro has not pled sufficient facts for this court to infer that KAS's statements were the but-for cause of the unnamed customer's decision not to purchase N-Yield.

As a result, this court finds that Eco Agro has not set forth a plausible claim for tortious interference with a business contract or relationship, and this court will dismiss this counterclaim.

### C. Counterclaim X: Commercial Disparagement

Based on the same statements that underlie Eco Agro's tortious interference claim, Eco Agro asserts that the statements made by KAS employees constitute "commercial disparagement." (Am. Answer (Doc. 25) at 34-35.) Eco Agro claims the statements have caused harmed and were unprivileged, false, defamatory, and made with a reckless disregard for the truth. (Id.)

KAS contends that the claim "should be dismissed because North Carolina does not recognize a tort of 'commercial

disparagement' independent of a claim under § 75-1.1." (KAS's Mem. (Doc. 28) at 39.) This court has conducted its own research and similarly cannot find a case that recognizes "commercial disparagement" as a separate, cognizable tort under North Carolina law. Eco Agro has set out a separate claim for defamation. Accordingly, Eco Agro's "commercial disparagement" claim will be dismissed.

### D.  Counterclaims VIII, XI: Remaining State Law Claims

This court finds that it would be inappropriate to dismiss the remaining state law claims of defamation and unfair and deceptive practices. KAS makes no argument that Eco Agro's allegations as to these claims are deficient on their own, relying instead on arguments this court has already rejected as being improper at this stage of the proceedings. (See KAS's Mem. (Doc. 28) at 37-40 (making arguments based on the insufficiency of Eco Agro's federal antitrust claims, the Noerr-Pennington doctrine, and federal preemption).) Therefore, this court finds it is not appropriate to dismiss these claims at this stage.

## VI.  CONCLUSION

**IT IS THEREFORE ORDERED** that Counter-Defendant Koch Agronomic Services, LLC's Renewed Rule 12 Motions to Strike Eco

-44-

Agro's Affirmative Defenses and to Dismiss Eco Agro's Counterclaims (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART**. Counterclaim IV (Violation of section 3 of the Clayton Act), Counterclaim IX (Tortious Interference with Prospective Business Contracts), and Counterclaim X (Commercial Disparagement) are **DISMISSED**. All other forms of relief requested by Koch Agronomic Services, LLC, are **DENIED**.

    **IT IS FURTHER ORDERED** that Koch Agronomic Services, LLC shall serve its responsive pleading to the remaining counterclaims within 14 days of the issuance of this Memorandum Opinion and Order.

    This the 29th day of September, 2015.

_____
United States District Judge

-45-